**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALLYSON M. GEGGATT,**

        **Plaintiff,**

**-vs-**                                                **Case No. 6:08-cv-1307-Orl-28DAB**

**DAVID DEESE AND QUINCO ELECTRICAL, INC.,**

        **Defendants.**

_____

# ORDER

Allyson M. Geggatt ("Geggatt") brings the instant action against Quinco Electrical, Inc. ("Quinco") alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") (Count VIII) and the Florida Civil Rights Act of 1992, Sections 509.092, 760.01-11, Florida Statutes ("the FCRA") (Count VI). Geggatt also brings two claims of battery (Counts II & III) against both Quinco and David Deese ("Deese"), a claim of defamation (Count IV) against both Quinco and Deese, and a claim of negligent hiring and retention against Quinco (Count IX).[1] Additionally, Deese has brought counterclaims against Geggatt for defamation (Counterclaim I) and defamation per se (Counterclaim II). (See Doc. 22 at 3-5).

This case is currently before the Court on the Motion for Summary Judgment (Doc.

---

[1] Geggatt also brought a claim for intentional infliction of emotional distress (Count I) against both Quinco and Deese as well as claims for sexual harassment under Title VII (Count VII) and the FCRA (Count V) against Deese individually. However, those claims were dismissed by this Court's September 11, 2008 Order (Doc. 19).

30) filed by Quinco and Deese (collectively, "the Defendants"). Geggatt has filed a Response (Doc. 31) thereto, and the matter is now ripe for adjudication. Upon consideration of the parties' briefs, the record evidence, and the relevant law, the Court concludes that the Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated below.

## I. Background

Quinco is an electrical contractor employing approximately 400 employees and providing both residential and commercial services in the central Florida area. (Deese Aff., Ex. 10 to Doc. 30). On October 8, 2007, Quinco hired Geggatt for a position as a mail room clerk working under the direct supervision of Vanessa Villalba ("Villalba"), the Vice-President of Quinco. (Doc. 37 at 13; Geggatt Aff., Ex. A to Doc. 31). Geggatt continued in this position for approximately three weeks before refusing to return to work based on alleged continuing sexual harrasment by Deese, the President of Quinco.

Geggatt describes several incidences that occurred at the workplace that she alleges constitute sexual harassment by Deese. First, Geggatt claims that Deese made two comments regarding her appearance. Sometime during Geggatt's second week of employment, Deese told her in passing that she "looked sexy." (Geggatt Dep. at 73, Mar. 11, 2009). No other person heard the comment, and Geggatt does not remember saying anything in response, instead choosing to "just walk[] away." (Id. at 74-75). Though Geggatt does not remember the exact wording of the second comment, Deese stated words to the

effect that Geggatt did not look as attractive as she previously did.² (Id. at 76-77). Again, no one else heard the comment and Geggatt said nothing in response. Geggatt claims that though these comments made her feel "uncomfortable and awkward," she did not feel that she was being sexually harassed until she spoke to her mother about them. (Id. at 78).

The next workplace incident complained of by Geggatt occurred in the mail room during the her third—and final—week of employment at Quinco. Geggatt avers that Deese "walked close behind me and brushed my buttocks with his hand" while Geggatt was standing next to the copy machine. (Geggatt Aff. ¶ 14). Geggatt denies that Deese groped her, instead stating that she just felt a brush of his hand.³ (Geggatt Dep. at 92). Other than Geggatt's looking over her shoulder to see who had made contact with her, neither party acknowledged the brushing and Deese continued down the hall. (Id. at 92-95). Geggatt states that though she hoped the incident was an accident, she was concerned and felt uncomfortable saying anything to Deese because he was the president of the company and because she wanted to keep her job. (Id. at 406; Geggatt Aff. ¶ 14). Again, no other person witnessed the brushing and Geggatt told no one at Quinco.

The final workplace incident involving Deese occurred during the final days of Geggatt's employment at Quinco. Geggatt described witnessing Deese at the opposite end

---

²Geggatt could not recall whether Deese told her that she "didn't look good that day," that she was "ugly," or that she was "not hot." (Geggatt Dep. at 76).

³Geggatt is unsure whether Deese brushed her buttocks with the front or back of his hand. When questioned whether she was sure that Deese touched her with his hand, Geggatt responded, "I felt fingers," and "[w]hether it was the back or front of the hand, I felt fingers." (Geggatt Dep. at 405).

of "a long hallway"—approximately fourteen to eighteen feet away—look directly at her and then "unzip his pants and make a thrusting gesture and then zip [them] back up when somebody came around the corner," though she later admits that she is unsure whether he actually unzipped his pants or just pantomimed doing so.[4] (Geggatt Dep. at 97, 99). According to Geggatt, Deese "put his hands out and then in and then thrusted himself" as if he was simulating an act of sexual intercourse. (Id. at 102-04). In her affidavit, Geggatt states that she "was scared when I saw . . . Deese do this because it looked . . . as if he was trying to communicate to me that he wanted to have sexual intercourse with me. I was afraid of what would happen next, but someone else came into the hallway from behind . . . Deese and he stopped and zipped up his pants." (Geggatt Aff. ¶ 17). Geggatt related that the event happened "really fast," with the entire event lasting less than one minute, and she made no comment to him and instead believes that she gave him a "weird look." (Geggatt Dep. at 98, 106). Again, Geggatt failed to report the incident to anyone at Quinco—including Rebecca Russo ("Russo"), Quinco's Director of Human Resources—claiming that she did not feel comfortable talking to a member of Quinco's management because the offender was Deese, the president of the company. (Id. at 115, 126).

On October 26, 2007, Leesa Clark ("Clark"), Geggatt's stepsister who also worked at Quinco, invited Geggatt to attend a birthday party for Russo that Friday night.[5] (Id. 127).

---

[4]When questioned whether Deese actually unzipped his pants, Geggatt responded, "no, I obviously was really far down the hallway to see that. But it looked like he was." (Geggatt Dep. at 97).

[5]Geggatt assumed that Deese was hosting the party because Clark told her that he "did this for employees[] at birthdays and stuff." (Geggatt Dep. at 131-32). Deese, however

-4-

Geggatt told Clark that she believed attending the birthday party would be a good way to get to know people from work and that she would think about it.[6] (Id. at 128). After returning home at the end of the work day, Geggatt called to inform Clark that she would go because she wanted to "get to know people that I work with."[7] (Id. at 130). Geggatt then picked Clark up and proceeded to Deese's house, where they waited in the car until everyone arrived. (Id. at 131). Prior to arriving at Deese's house, Geggatt knew that Deese would be attending the party because they were meeting at his house while waiting for a limousine to take them to dinner. (Id. at 131-32) Geggatt was unconcerned that Deese was attending the party because her stepsister and a number of others where there as well. (Id. at 132).

Approximately ten people—including Geggatt, Clark, Deese, Villalba (the Vice President of Quinco and Deese's fiancee), Russo (the Director of Human Resources), Richard Cavazos and his wife, and Joe Cartas ("Cartas")—rode in the limousine to a sushi restaurant where additional people unknown to Geggatt joined the party. (Id. 133-34). After dinner, the party continued at a club in downtown Orlando where Geggatt had "two or three" drinks. (Id. 135, 138). While in the limousine after leaving the club, Geggatt felt sick

---

states that he simply arranged for the use of a limousine as a birthday present to Russo and that Russo paid for the birthday party herself. (Deese Aff. ¶ 5).

[6]Notably, Geggatt admits that even after the events described as occurring in the workplace but prior to the events of the evening of October 26 and 27, 2007, she wanted to remain employed at Quinco. (Geggatt Dep. at 130).

[7]Initially, Geggatt stated in her deposition that she "wanted to keep my job going." (Geggatt Dep. at 129-30). When pressed on this issue, she clarified that she did not believe that her attendance at the birthday party would control whether she was fired or not, but she wanted to go so that she could "get to know people that I work with." (Id. at 130).

because of the combination of sushi and alcohol that she had ingested. (Id. at 138). She placed her head in Cartas's lap because she was not feeling well during the ride back to Deese's house. (Id. at 140). Upon returning to Deese's house, Geggatt exited the limousine, feeling like she was going to vomit. (Id. at 141). She walked to the edge of the driveway but does not remember if she threw up or not. (Id. at 142). At this point, Geggatt alleges that as she was about to vomit, Deese "came up next to me and kind of whacked me upside the head . . . saying that I shouldn't get sick." (Id. at 143). Geggatt stated the contact felt like a fist because "it was a lot harder than just like a slap." (Id. at 147). After Deese hit Geggatt, she claims that "[h]e said something mean, because I remember being offended, but I don't remember what he said" because she was feeling ill. (Id. at 149). Geggatt did not respond to the blow or to the comments made by Deese and instead entered her car, which Cartas then drove to his house, where Clark and Geggatt stayed the night in his spare bedroom.[8] (Id. 150).

The next morning Geggatt dropped Clark off at her house and returned home. (Id. at 180). Later that day—Saturday, October 27, 2007—Cartas and Geggatt had a conversation concerning whether Cartas planned on attending a continuation of Russo's

---

[8]Though for the purposes of summary judgment the Court accepts Geggatt's version of the events as true, Deese's recollection of the events after leaving the club on Friday evening deviates significantly from Geggatt's. Deese states that after returning from the club, he walked outside and found Geggatt and Clark passed out in the front seat of Geggatt's car. (Deese Aff. ¶ 7). He claims to have reached through an open window and "tapped Geggatt on the back of her head in an effort to wake her." (Id.). Deese then reached in to turn the car off and remove the keys from the ignition. (Id.). Clark and Deese later left with Cartas and an unidentified fourth person. (Id.).

birthday party later that night.[9] (Id. at 199). Cartas instructed Geggatt to call Deese's house to learn the plans for the evening and what time to meet at his house. Geggatt called Deese who instructed her to meet in front of his house that evening.[10] (Id. at 200-02). Not knowing the evening's plans, Geggatt thought that it would still be a fun evening even though Deese would be attending. (Id. at 202). However, because she felt uncomfortable being alone with Deese without Clark,[11] Geggatt invited her friend Kathi Brown ("Brown") to accompany her.[12] (Id. at 221). After the group gathered at Deese's house, they all entered a limousine and headed to the Diamond Club, an exotic dancing establishment, a destination to which Geggatt had no objection.[13] (Id. at 228). While in the limousine and at the Diamond Club, Geggatt had no conversation with Deese and nothing unusual happened. (Id. at 230-31).

---

[9]Geggatt learned sometime during Friday night that the birthday party would be continuing the next night. (Geggatt Dep. at 199). The record is unclear as to whether Geggatt called Cartas or Cartas called Geggatt to discuss if they would be attending. When Cartas asked Geggatt if she planned on going, she responded that she was not sure. (Id. at 200).

[10]Geggatt states she did not know where the party would go that night prior to the group leaving Deese's residence in the limousine. (Geggatt Dep. at 206).

[11]Clark had decided early that day that she would not be attending the night's festivities because she was either hanging out with her boyfriend or another coworker who does not socialize with Deese and the others. (Geggatt Dep. at 193).

[12]Geggatt, who describes herself as "gay," (Geggatt Dep. at 10), learned later that night that Brown wanted to have a physical relationship with her. (Id. at 224). However, Geggatt did not know at the time she invited Brown that Brown was romantically interested in her. (Id.).

[13]Based on prior conversations with Clark, Geggatt assumed that Deese had rented another limousine. (Geggatt Dep. at 210). However, Geggatt provides no evidence that either Quinco or Deese funded any portion of the events of Saturday night.

The party left the Diamond Club and proceeded to Dancers Royale, another exotic dancing establishment. While at Dancers Royale, the members of the group were gathered in a large circle in a crowded area. (Id. at 232, 237). According to Geggatt, Deese, without any prompting or prior discussion,[14] stated, "I can get her home for $10,000" while looking directly at Geggatt. (Id. at 244-45). Geggatt responded "no," and Deese then turned to Brown and replied, "I think I can." (Id. at 244-45). Other than this brief exchange, there was no other conversation between Deese and Geggatt, nor were there any further incidents that caused Geggatt concern while the party continued at Dancers Royale or during the return to Deese's house.[15] (Id. at 246).

Geggatt, though admittedly feeling "uncomfortable" with Deese's comments at Dancers Royale, decided to continue the evening's activities with the group after being invited to join the "after party" at Deese's house. (Id. at 247). The party proceeded upstairs to Deese's party room, which contained a pool table, a bar, and a separate room with a

---

[14] When questioned who first mentioned the $10,000 phrase that evening, regardless of context, Geggatt responded that "[a]s far as I know, it was him, but I don't really know." (Geggatt Dep. at 240). Geggatt denies any memory of another member of the group shouting out "would you go home with someone for $10,000" or anyone else responding "yeah, I would." (Id. at 241). Geggatt, however, does acknowledge that such a statement may have been made and she my have been unable to hear it. (Id.).

[15] Deese tells a slightly different story. According to Deese, while he was engaged in a discussion with a bouncer, he overheard a portion of a conversation of some of the women of the group discussing getting someone to go home with them for $10,000. (Deese Aff. ¶ 9). Though not knowing what the women were talking about, he turned toward the group and repeated the words that he had heard, "I could get her home for $10,000." (Id.). Deese claims that he never stated the he thought he could have sex with Geggatt for $10,000 or that he believed Geggatt would have sex with anyone else for $10,000. (Id. ¶ 10). Additionally, Deese denies making any sexually explicit comments to Geggatt or that she said anything about being offended by the comment regarding $10,000. (Id.).

movie theater. (Id. at 249). While sitting by the pool table, Geggatt received a series of phone calls from her ex-girlfriend, Vanessa Scotland ("Scotland"), and this began to upset Brown, who left Geggatt sitting at the pool table and went to the movie room. (Id. at 253-55, 257). After Brown complained to Deese about Geggatt's phone conversations with Scotland, Deese left the bar area where he had been making drinks for the party guests, approached Geggatt, and took her cell phone while she was speaking with Scotland. (Id. at 262, 264-65). Deese then questioned Geggatt as to why she was speaking with her ex-girlfriend when she was supposed to be at the party with Brown. (Id. at 264).

After taking Geggatt's phone, Deese began talking to Scotland as he walked towards the movie room while Geggatt tried to retrieve the phone from him. (Id. at 267). Scotland did not know at this point that Geggatt was attending the party with Brown or that Brown had become upset with Scotland's continuing calls and that Brown had complained to Deese. (Id. at 268). Once Deese entered the movie room, he joined Brown on the couch as he continued talking with Scotland. (Id. at 271). Deese repeatedly stated "Fuck you" into the phone and told Scotland that "she is sucking his dick" and "she is having sex with [Brown]"[16] before he hanging up the phone.[17] (Id. at 271-72). Scotland continued to call back, but

---

[16] Though Geggatt admits that Deese did not specifically state that she was the "she" referred to in these comments, she presumed as much because the only people in the movie room at this time were her, Brown, and Deese. (Geggatt Dep. at 274-75).

[17] Scotland's account closely parallels Geggatt's. According to Scotland, a male, self-identified as "God," answered Scotland's call to Geggatt and asked "Who the fuck is this?" (Scotland Dep. at 14). Scotland requested that she be allowed to speak with Geggatt after hearing Geggatt asking for her phone in the background. (Id.). However, Deese told her that "Ally is too busy" and then hung the phone up. (Id.). When Scotland called again, the same person answered, told Scotland that Geggatt was too busy to speak to her because

-9-

Deese—after refusing to return the phone to Geggatt—continued to answer the phone and immediately hang it up. (Id. at 272, 276). While Deese was doing this, Brown was sitting next to him, appearing "happy about the whole thing because she doesn't like [Scotland] at this point." (Id. at 277). After approximately thirty minutes of Deese arguing with Scotland, Villalba took the phone from Deese and told Scotland that Geggatt was in the bathroom before hanging up the phone. (Id. at 286-87). After Villalba hung up the phone, Geggatt entered the bathroom and started to cry. (Id. at 286). Geggatt remained in the bathroom for approximately fifteen minutes before returning to the pool room. (Id. at 290). Because she was beginning to cry, Deese returned Geggatt's phone to her, gave her a hug, and says "sorry for being a dick." (Id. at 290-92). Geggatt—who had the keys to her car in her possession at all times[18]—and Brown then left Deese's house, and Geggatt returned Brown

---

she was currently "sucking my cock," and ended the phone call. (Id. at 14-15). Scotland then used a pay phone to call again. (Id. at 16). The same voice answered again and told her to "Get over [Geggatt]. She's with [Brown] now." (Id.). When Scotland asked to come to meet Geggatt, the person on the phone stated, "If you come down here, I'm going to beat your ass. You're nothing but a monkey-fucker. You're a nigger-fucker," apparently referring to Scotland's then-girlfriend, who was black. (Id. at 16-17). The person on the phone ended the conversation by stating that "[Geggatt]'s fucking [Brown] in the bedroom" and that he had to go join them so that Geggatt can "finish him off." (Id. at 17). Scotland called Geggatt's phone a fourth time. Brown answered and told Scotland that she was going to beat her up before handing the phone to "God," who stated, "Can't you get a fucking hint? Leave us alone." (Id. at 19).

[18]Geggatt states in her deposition that she had her keys the entire night. (Geggatt Dep. at 296). However, Deese claims that he had previously taken her keys from her because he feared that she had been drinking and that he returned them when Geggatt requested them. (Deese Aff. ¶ 14).

to her house.[19]  (Id. at 292-296).

Geggatt claims that following the events of that weekend, she felt uncomfortable returning to work, so she called in sick on both October 29 and 30, 2007.  After calling in sick for those two days, Geggatt refused to return to work because she feared that "Deese [would] try to use his position as [her] employer to force [her] to have sex with him." (Geggatt Aff., Ex. A to Doc. 31).

## II.  Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant

---

[19]Though for summary judgment purposes, the Court accepts Geggatt's version as true, Deese's version of the events at his house after returning from the strip club differs significantly.  Deese claims that he entered the movie room, where he found Geggatt and Brown arguing because Scotland continued to call Geggatt. (Deese Aff. ¶ 12).  Brown then handed him Geggatt's cell phone and asked that he have Scotland stop calling. (Id. ¶ 13). To Deese, it appeared as if both Geggatt and Brown were upset by the continuing phone calls from Scotland, so in an attempt to defuse the situation, he told Scotland to stop calling and that Geggatt was in another relationship.  (Id. ¶¶ 12-13).  He specifically refutes saying "she is sucking my dick" or that "she is fucking [Brown]."  (Id. ¶ 13).

-11-

evidence,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. Analysis

A. Title VII and FCRA[20]

Title VII prohibits discrimination on the basis of sex that alters the terms and conditions of a person's employment. 42 U.S.C. § 2000e-2(a)(1). "An employee can

---

[20]Because the FCRA is patterned after Title VII, courts have consistently applied case law interpreting Title VII to claims brought under the FCRA. See, e.g., Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1195 n.1 (11th Cir. 2004). Accordingly, Geggatt's FCRA claim is considered in conjunction with her Title VII claim, and the discussion of the Title VII claim applies equally to the FCRA claim. The FCRA claim will not be addressed separately. Myers v. Cent. Fla. Invs., 237 F. App'x 452, 454 (11th Cir. 2007) ("The FCRA claims stand or fall with the Title VII claims, so our analysis focuses on the federal allegations.").

-12-

establish a violation against an employer in either of two ways: 1) through tangible employment action-i.e., discharge, demotion, pay decrease, etc.; or 2) through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of the work." Nurse "BE" v. Columbia Palms West Hosp. Ltd., 490 F.3d 1302, 1308 (11th Cir. 2007). Because Geggatt has not alleged that either Deese or Quinco took any tangible employment action against her, she proceeds under a hostile work environment theory only.

To establish a Title VII hostile work environment sexual harassment claim, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). However, "'[a]s a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees.'" Meece v. Atl. Se. Airlines, Inc., No. 1:04-CV-3698-WSD-ECS, 2006 WL 2228937, at *2 (N.D. Ga. Aug. 2, 2006) (quoting P.F. v. Delta Air Lines, Inc., 102 F. Supp. 2d 132, 138 (E.D.N.Y.2000), vacated on other grounds by Ferris v. Delta Air Lines, Inc., 277 F.3d 128 (2d Cir. 2001)). "'[W]hen the sexual acts occur outside the work place, the plaintiff must identify sufficient facts from which to infer a connection between the hostile sexual conduct and the employment.'" Meece, 2006 WL 2228937, at *2 (citing P.F., 102 F. Supp. 2d. at 138). When

"a supervisor uses his authority to compel the victim of harassment to meet outside the office," however, "the harassing acts might be imputed to the employer." Devlin v. Teachers' Ins. & Annuity Ass'n of Am., No. 02 Civ. 3228(JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003).

Geggatt has not identified sufficient facts from which this Court can infer a connection between Deese's alleged hostile sexual conduct and Geggatt's employment other than her subjective belief that her job would be affected if she did not go out with the group on Saturday night, a belief that is belied by Clark's decision to stay in that same night. (See Geggatt Dep. at 417). Nor has Geggatt presented evidence to support a finding that any Quinco employee compelled Geggatt to attend either night of Russo's weekend-long birthday party. Geggatt admits that neither Russo nor Deese invited her to attend the Friday night party; instead, she was invited by Clark. Evidence has been submitted showing that some Quinco employees who were invited opted not to attend Russo's party with no apparent consequences for such decision. (Deese Aff. ¶ 5). Geggatt also admits calling Deese on Saturday to inquire as to what time she should arrive at his house. This Court does not find that Deese compelled Geggatt to attend Saturday night, especially in light of Clark's decision to remain at home with no subsequent adverse result. Accordingly, Deese's statements can not be imputed to Quinco, and this Court does not consider the events of October 26 or 27 when analyzing Geggatt's claims for sexual harassment.[21]

---

[21]Even if the Court considered the events of Friday and Saturday night, the result would not change. Geggatt herself admits that nothing occurring on Friday night between her and Deese was of a sexual nature. (Geggatt Dep. at 338). Geggatt has presented no evidence that the alleged battery of Friday night was "based on the sex of" Geggatt, and

-14-

Defendants assert that Deese's conduct does not satisfy the fourth element, which requires the harassing conduct to be sufficiently severe or pervasive so as to alter the terms and conditions of employment and create a discriminatorily abusive working environment. (Doc. 30 at 12). "Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'" Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000), abrogation on other grounds recognized by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008). In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the U.S. Supreme Court explained that this element contains both a subjective and objective component Id. at 21-22 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246

---

therefore, this claim would not support a claim for sexual harassment. Regarding the comment at Dancers Royale that Geggatt took to be a statement from Deese that he could have sex with her, Geggatt admits that these were "just words" and that Deese did not make any sexual advances to her. An offhand comment such as described in the facts of this case, when considering all the circumstances including the social occasion and location in which the comment was made, does not rise to the level of "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." Finally, the verbal altercation between Deese and Scotland was not based on Geggatt's sex; instead, the altercation arose because of Scotland persistent phone calls and Deese's attempt to satisfy Brown's request that he make Scotland stop calling.

(11th Cir. 1999) (quoting Harris, 510 U.S. at 21).

Though Geggatt contends that she subjectively believed that Deese's conduct was so severe or pervasive that it created a hostile work environment, a review of the record evidence does not support such a finding. There is no evidence that Geggatt sought any counseling or suffered psychological harm as a result of Deese's actions. See Harris, 510 U.S. at 23 ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."). More importantly, Geggatt continued to socialize with the alleged perpetrator of the sexual harassment. Geggatt, aware that Deese would be present at the party, voluntarily went to Deese's house, where she boarded a limousine transporting a number of individuals to a sushi restaurant and to a club for drinks. Even after Deese had allegedly battered her, Geggatt called Deese the next day to discover what time she should meet at his house to continue the party that evening. Despite her ability to leave at any time after returning to Deese's house from the strip clubs where Deese made the comment regarding "I can get her home for $10,000," Geggatt again voluntarily decided to remain in Deese's presence. These actions are not actions consistent with one who subjectively perceives the workplace conduct complained of—Deese's statements regarding Geggatt looking "sexy" and not as attractive as she previously did, Deese's hand brushing her buttocks in passing, and the sexually suggestive motions made by Deese in the hallway—as being "sufficiently severe and pervasive to alter the terms or conditions of employment."

Additionally, the record evidence does not support a finding of an objective belief that Deese's conduct was so severe or pervasive so as to create a hostile working environment.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23). When determining whether harassment objectively altered the terms and conditions of employment, courts look to four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

Geggatt specifies four instances in a three-week period which she found to be offensive.[22] Deese's comment that Geggatt "looked sexy," another comment that she did not look as attractive as she previously did, his brushing of Geggatt's buttocks while passing in the hallway, and his simulation of sexual intercourse in a hallway with no other witnesses around, though "taunting and boorish," were not physically threatening or humiliating. See Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1027 (11th Cir. 2008). Except for the brushing incident, Deese never touched her during these incidences. Regarding the simulated sexual act, Deese was more than fifteen feet away. Given the totality of the circumstances, a reasonable person would not consider these actions as severe or physically threatening or humiliating. See id. at 1028; see also Mendoza, 195 F.3d

---

[22] Because of Geggatt's abbreviated tenure at Quinco, the Court does not discuss whether the conduct complained of satisfies the frequency factor of the harassing conduct. Even if the Court assumed Deese's conduct to be frequent, this "does not compensate for the absence of the other factors." Mendoza, 195 F.3d at 1248.

at 1243-44 (finding that supervisor who repeatedly stared at employee's groin while sniffing and who brushed against employee without comment insufficient to establish hostile work environment). Additionally, Geggatt has produced no evidence demonstrating that the workplace conduct interfered with her work performance in any manner. In fact, Geggatt stated that prior to the weekend. she wished to remain employed at Quinco. (Geggatt Dep. at 130).

Because the harassment was not, on either a subjective or objective basis, "sufficiently severe or pervasive to alter the terms and conditions of employment and create a disciminatorily abusive working environment," Geggatt hostile work environment claims under Title VII and the FCRA fail. Summary judgment is granted to Quinco on Count VI and Count VIII.

### B. State Law Claims

Having disposed of Geggatt's federal claim under Title VII, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed). Accordingly, Geggatt's state law claims (Counts II, III, IV, & IX) and Deese's counterclaims shall be remanded to the state court from which this case was removed.

### IV. Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** as followed:

1. Defendants' Motion for Summary Judgment (Doc. 30) is **GRANTED IN PART** and **DENIED IN PART**. Summary Judgment is **GRANTED** as to Count VI and Count VIII and

**DENIED** without prejudice as to Counts II, III, IV, and IX.

2. The Clerk is directed to enter judgment providing that Plaintiff shall take nothing from Defendants on Count VI or Count VIII.

3. All other pending motions are **DENIED as MOOT**.

4. Pursuant to 28 U.S.C. § 1367(c)(3), the remaining state law claims and counterclaims are hereby remanded to the Circuit Court, Ninth Judicial Circuit, in and for Orange County, Florida, Case No. 07-CA-15189 #34, <u>Allyson M. Geggatt v. David Deese, et. al</u>.

5. The Clerk shall close this file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 10th day of September, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Circuit Court, Ninth Judicial Circuit in and for Orange County, Florida